IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Matthew Jamison, #267844, | ) | |
| | ) | C/A No. 9:15-2859-MBS |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| Levern Cohen, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Matthew Jamison is an inmate in custody of the South Carolina Department of Corrections. Petitioner currently is housed at the Broad River Correctional Institution in Columbia, South Carolina. Petitioner, proceeding pro se, filed a petition for writ of habeas corpus on July 22, 2015, alleging that he is being detained unlawfully. See 28 U.S.C. § 2254.

## I. BACKGROUND

Petitioner was assaulted by Jamie Jackson, also known as "Jig," along with some of Jig's friends, on May 20, 2000. Jig fired at Petitioner as Petitioner fled the scene. On May 23, 2000, Jig and his friends assaulted Petitioner's sister and, during the incident, hit Petitioner's daughter in the face. On June 11, 2000, Petitioner was attending an after-party outside of the National Guard Armory in Columbia, South Carolina, when he was approached by Jig and a number of his cohorts. Petitioner opened fire, and as a result shot and killed a fifteen-year-old youth. Petitioner was indicted for murder.

On August 27, 2001, Petitioner, represented by John D. Delgado, Esquire, appeared before the Honorable L. Casey Manning, where he entered a negotiated plea of voluntary manslaughter. At the plea hearing, Judge Manning conducted a thorough colloquy with Petitioner. Among other

things, Judge Manning stated:

> THE COURT:   You're pleading to voluntary manslaughter?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: The allegation I just read to you would be for murder.  But you're not pleading to murder.  But that's what it says.  You understand that.  You shot him; he died.  They're taking out the malice and just saying that you – it's a voluntary manslaughter plea.
>
> Do you understand all that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Okay.
>
> And that's what you want to plead guilty to, really shooting Mr. Dreher?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right.
>
> You realize, Mr. Jamison, that by pleading guilty to voluntary manslaughter that you can go to jail for thirty (30) years?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Knowing then, sir, that you can go to prison for thirty (30) years by pleading guilty to voluntary manslaughter, do you still want to plead guilty to it?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right.
>
> . . . .
>
> . . .  I'm not saying that I will, but you need to realize that the thirty(30) years that you're facing on this voluntary manslaughter, I could run that consecutive to the eight (8) years you're currently serving.
>
> Do you understand that?

THE DEFENDANT: Yes, sir.

. . . .

Now, realizing, Mr. Jamison, that when you plead guilty, you admit the truth of the allegation contained in this indictment against you. You're saying that I had a gun and I shot Mr. Dreher and he died.

You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

I tell you that, sir, because you may have some defenses to this charge, Mr. Jamison. Of course, I have no way of knowing that, but you need to realize that by pleading guilty here today, you give up any defenses you might have.

Do you understand that, sir?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: All right.

Now, Mr. Jamison, I'll ask you, once again, did you commit this offense?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Now, Mr. Jamison, has anyone promised you anything or held out any hope of reward in order to get you to plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Has anyone threatened you or used force to get you to plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Has anyone used any pressure or intimidation to cause you plead guilty?

. . . .

So, once again, and finally, Mr. Jamison, you're pleading guilty to Indictment Number 2000-53234 because on June the 11th, 2000, you shot one Alton Jarod Dreher, who died as a result thereof?

THE DEFENDANT: Yes, sir.

ECF No. 19-8, 12-23.

Petitioner appeared before Judge Manning on August 28, 2001 for sentencing. The solicitor

recounted the facts as follows:

The victim, 15-year-old Alton Dreher, was just really at the wrong place and hanging behind the wrong people at the wrong time which cost him his life. I just need to give you some very brief information as to why, background information, as to why this is a manslaughter case.

. . .

Three weeks before this shooting, your honor, the defendant was at his house with his daughter and a girlfriend or the mother of the daughter. A number of individuals whose nicknames are "Jig", "Little Thee", "Fax", "Butter", they went to the defendant's house. They beat him up; they pistol-whipped him; they shot at him. About two or three days after that accident, those same individuals I just mentioned smacked the defendant's sister. Warrants were obtained for those individuals for what they had done to the defendant's sister.

The importance of that is that when we jump forward to June the 11th, the date of this incident, Alton, the victim, was at a party at the Armory that night. It was a Saturday night. Also at the party were those individuals I just mentioned: "Jig", "Butter", "Little Thee". . . .

The defendant – the victim Alton really didn't even know these individuals but for the fact that one of them is his cousin. It's our understanding, he just went up to them to talk to them briefly and then he was going off with his girlfriend. You know, wasn't really even hanging out with them, but unfortunately the one time he went to talk with them was when Mr. Jamison, the defendant, saw those individuals, pulled out a gun, a .38, and began firing into the crowd at those individuals. One of the bullets struck Alton right on the right side. It went through a number of his organs and he died right there at the scene.

4

. . . One of the other tragic parts of this case was that nobody even came forward. Of the hundreds of people at that party, not one was willing to give the police a statement that night as to what they saw and heard.

. . . Investigator Gaymon come there that night and he took a statement from the defendant, who really pretty much admitted everything I've told the court today.

Id. at 25-28.

Petitioner's counsel then addressed the court:

[The defendant] had no individual animus against Alton Dreher. Alton was standing with a group of folks that had been engaged with Matthew some time in the past and that night as well and he fired towards that crowd because he thought that they were coming at him and he was coming at them.

And he understands the aspect we know in the law as transferred intent. It was not a self-defense. It may have been a very imperfect self-defense. But those are the issues that we would have brought forward. But he had no individual animus. He had no reason. Didn't even know this boy. It was a shot at a crowd of people in a very crowded environment in which this young man was struck and killed and died as a result.

Id. at 34-35.

Judge Manning sentenced Petitioner to incarceration for a period of twenty years. Petitioner did not file a direct appeal.

On June 24, 2002, Petitioner filed an application for post-conviction relief (PCR) in which he alleged ineffective assistance of counsel. On April 27, 2005, Petitioner, represented by counsel, appeared before the Honorable G. Thomas Cooper on his PCR application. The court heard testimony of Mr. Delgado. Mr. Delgado recounted his conversations with Petitioner prior to the plea hearing. He stated, among other things:

I don't think that the facts were murder. They were a case of voluntary manslaughter. There was an issue of transferred intent. This involved a shooting at a dance out at the National Guard Armory on Bluff Road. Matthew had been put upon by some fellows, more than one, some incident at his home some weeks before. He ran into

5

those fellows that same night. His statement was that they came at me and I came at them. And he had a gun and fired it. There was an issue of whether or not – the young man who was killed was a 15-year-old boy – whether or not the issue of transferred intent was there.

I tried to explain that to Matthew, that the intent to kill the other fellow who he was trying to kill and his killing a young boy would not have been thought of very highly by a jury. Seeing all that, I thought a manslaughter charge, a manslaughter conviction was very imminent if we got around the murder. You never know how that goes. And the 20 years weren't to Matthew's liking, but it sure is a difference better than 30 to life.

. . . .

It would have been a significant risk of conviction of manslaughter. And knowing the way that may have played out, I think the Court could have sentenced him easily then to 30 years on that charge alone. A 20-year guilty plea was a significant reduction and I thought that was in his best interest.

Id. at 60-62.

Mr. Delgado further testified in response to questioning by PCR counsel:

Q. Okay. So, is it true that Matthew from pretty much the start of the very eve of trial said, I want to go to trial on this?

A. Yes, ma'am.

Q. Okay. In reviewing the case for trial, did you all ever discuss the evidence that came back from SLED showing that the victim had gunpowder residue . . . on the back of her *[sic]* hand?

. . . .

A. Sure. My recollection, in fact, I believe I spoke to Ms. Kimberly Black, something like that, the SLED agent who gave that report. And she talked about the round of lead particles that are indicative of gunshot residue on the back of the palm which would have meant that the 15-year-old who was shot had some gunshot residue hit the back of his palm. Not that he was reaching for a gun, but that he may have been using that as a deflection when somebody grabbed him and put him in the line of fire.

Matthew's intent was never to – that boy had never caused him a problem. He was

6

just with a gang of fellows that had threatened Matthew. Matthew was after somebody named "Jig". "Jig" is the fellow that had assaulted him, and it was "Jig" that he was trying to hurt that night. He told me that. . . .

. . . .

[Our theory of defense] was that "Jig" had a gun and had come at – had come at Matthew. It was a very imperfect self-defense because nobody else sees a gun. There was no other gun found, as I recall it. Matthew in his statement to the police . . . fails to say to the police, I saw "Jig" with a gun while he was coming at me. His words were, "they were going to blitz me." That means a whole bunch of them were going to jump him.

But later he tells me that "Jig" had a gun. And we wouldn't ever verify that. I mean, I talked to lots of witnesses, went to the scene, had a private investigator. We went out several times trying to get any one person to say that "Jig" had a gun. We couldn't do that.

Q. Okay. Now, let me ask you this. Was the possibility of this case ever going capital discussed?

A. Gosh. I don't think so. I mean, if you can point out something to me. I just don't know what aggravated –

. . . .

Q. So to your knowledge, nobody, either you nor anybody on your staff, would have told his family that had he not taken the plea he would face a potential capital sentence? That was never discussed?

A. No ma'am. I mean, right now I'm trying to say, what aggravated could there have been?

. . . .

Q. So there was never a notice of intent or anything like that?

A. No ma'am. Oh, no, ma'am. No, ma'am.

Id. at 64-68.

Petitioner next testified. He stated that he had been represented on drug charges by another

attorney, Theresa Johns, and that Ms. Johns had worked out a deal with the Solicitor such that Petitioner could plead to the murder charge and receive a sentence of seven to ten years. Id. at 27; ECF No. 34-1. However, Petitioner hired Mr. Delgado because he wanted to go to trial. ECF No. 19-8, 80. Petitioner testified that Mr. Delgado spoke to Petitioner on a Saturday and stated he (Mr. Delgado) would be ready for trial on Monday. According to Petitioner:

> But when I get down here Monday, he pulled me out the holding cell. And at first he tells me about a plea between 11 to 13 years. Going by the guidelines, he showed me some of the paperwork, and he was saying they worked it out. He was like, I'm going in front of the best plea judge there was. Judge Manning. And like the 11 to 13 years was the most I would get because – and the only reason of that is because of my prior conviction. . . .
>
> . . . .
>
> Q. Okay. Did he ever discuss with you that a plea to voluntary manslaughter exposed you to up to 30 years?
>
> A. No. He ain't never spoke that to me. I tell you, we ain't never talked about no plea until that day when I got up here to the courthouse.
>
> Q. Okay. And after he brought up the possibility of the guilty plea, what happened then?
>
> A. I tell him, nah, I still want to go to trial. So I'd say about an hour later he called me into a little back room where my family members was crying and stuff telling me I was going to get the death penalty; and, you know what I'm saying, I needed to plea.
>
> Q. Had you ever discussed the possibility of a capital sentence in connection with the murder?
>
> A. That. We ain't never brought that up until he set up a little meeting back there. And he already had been talking to my family members.
>
> . . . .
>
> [T]he only reason I even pleaded was because he telling me I'm going to get the death penalty. It ain't like he gave me no options saying that, well, you can go the

trial and this, this, this, or you know what I'm saying. Nah. If we go to trial, you're going to get the death penalty.

. . . .

[At the plea hearing], when [the judge] was asking me the questions, I understood the questions but not truly what he meant about the questions. Right? Like have I been promised anything. And then I was basically too afraid to even say something about that . . . . And basically when I was answering the questions, I was answering going off of his advice, you know what I'm saying.

Id. at 81-86.

A number of Petitioner's relatives and his girlfriend testified consistent with Petitioner's statement. Id. at 88-96.

On July 13, 2005, the PCR judge issued an order in which he found the testimony of Petitioner's counsel more credible than that of Petitioner or his family and girlfriend, especially as to the issue of the discussion of the death penalty. The PCR judge found that Petitioner was accurately and sufficiently advised as to the advantages and disadvantages of pleading guilty and that Petitioner pleaded guilty freely and voluntarily and obtained a benefit as a result. Consequently, the PCR judge denied Petitioner's application for relief. ECF No. 103-107.

On or about November 3, 2005, the South Carolina Office of Appellate Defense filed a petition for writ of certiorari pursuant to Johnson v. State, 364 S.E.2d 201 (1988), raising the following sole issue:

Whether petitioner's guilty plea complied with the mandates set forth in Boykin v. Alabama?

ECF No. 19-1.

Petitioner, proceeding pro se, attempted to supplement appellate counsel's brief with a report of an investigator. Among other things, the investigator had located a witness, Theotis Bellamy, who

gave an affidavit dated November 28, 2005, stating that he saw "Jig" shoot at Petitioner the night of the murder. According to the investigator, Bellamy did not give a statement earlier because he had been threatened by "Jig." ECF No. 19-2, 16; see ECF No. 19-16.

The South Carolina Court of Appeals denied Petitioner's pro se motion to supplement the petition on September 29, 2006. ECF No. 19-2. The Court of Appeals denied the petition for writ of certiorari by order filed March 6, 2007. ECF No. 19-3.

Meanwhile, on November 28, 2006, Petitioner filed a second application for PCR, asserting that he had discovered evidence that by due diligence could not have been discovered in time to move for a new trial under S.C. R. Civ. P. 59(e). ECF No. 19-16. Petitioner attached to his second application the affidavit of Theotis Bellamy regarding his recollection of the June 11, 2000, incident. The matter came before the Honorable William P. Keesley on June 27, 2008. Notably, Mr. Bellamy testified at the second PCR hearing:

> Q: All right, sir. Now, you heard the testimony of Mr. Jamison in his questions by the State about these – the people, you know, why you didn't come forward and all that in the beginning. Did you know these people or the people that were kind of in this little, I'll use gang loosely because it may not have been a formal gang, but just a group of people?
>
> A. Yes, sir.
>
> Q. And you knew them?
>
> A. Yes, sir.
>
> Q. What were they? Were they dangerous?
>
> A. Yes, sir.
>
> Q. And were they capable of hurting somebody?
>
> A. Yes, sir.

. . . .

Q. . . . [W]hat made you want to come forward and bring this testimony to the court now?

A. Because I have felt comfortable for the simple fact because that I heard that Jig had done got lock up, not on the streets. So now I feel really comfortable because he's not on the street.

Q. If he couldn't hurt you, he'd hurt somebody else?

A. Yes, sir.

. . . .

Q. All right. What did you see? Now, I've got your affidavit and that's just what you wrote down as far as what happened –

A. Yes, sir.

Q. – will you tell us in your own words what happened, what you saw?

A. What I saw, I – first, of all, when the incident first occurred in Greeley Street at a laundry mat, that's where Matthew's sister and his baby mama, Terrance Currie a/k/a Stutter boy . . . been assaulted Matthew's sister.

Q. Why?

A. Then his baby mama been out there, too, so at the same time, when he assaulted Matthew's sister, he missed and hit Matthew's baby in the eye. Then after that, you know what I'm saying, Matthew like he been, like across the street, like over there at Alaban Court and I saw Jig, Butter, and Terrance, they was assaulting Matthew. So while Matthew being – and they shot at Matthew while Matthew been fleeing the scene. So after that, so they had after a little concert, been coming downtown, so we went at the auditorium one night.

. . . .

So me and Jamison, we cool, you know what I'm saying. The other ones, they ain't, you know what I'm saying, they must be ain't liked him, so they gave him a look like, yeah, we're going to get you tonight like that. They was going to get him tonight like that.

11

Q.  So you knew that they had been after Matthew for some time?

A.  Yeah, but I ain't really knew, like, how serious is, like how serious it was, you know what I'm saying, but I know the dudes that I hang – that I been hanging around with, I know they been like dangerous.  I know they're known for keeping weapons and stuff like that, right. . . .

So after that . . . they had, like, a little after-party down there at the National Guard Armory, right.  So we're walking through there, right, walking through there, walking through there.  So I keep seeing, like, why they're walking through like they're looking for somebody or something like that, right.

So at that time, my sister and my cousin been had called me back, right.  They talked to me because they – because I finally noticed, I'd seen them, like, walking up on Matthew, right, walking up on him and I knew they had – they been armed, right, I knew they been armed. . . . So they approached Matthew, right.  So like – they, like, approach him like they're fixing to, you know what I'm saying, like they're fixing to pull out weapons or whatever like that, right. . . . And I knew Jig had a gun on him. I knew he had a gun on him.  So I seen like he about to pull, right.  So Matthew, like, he had to defend himself, right, that night or unless he was going to – unless he was going to be the one that been dead or something like that.

. . . .

Yeah.  So either way it go, he ain't really have no choice or he wouldn't be living right now.

ECF No. 19-16, 143-50.

Mr. Bellamy further testified that Jig had pulled the 15-year-old in front of him and used him as a shield.  He stated that Jig ran away from Petitioner when Petitioner started shooting, "pull the little boy away, like covering, running with the boy shielding him, so the little boy could take all the shots."  Id. at 164.

The second PCR judge issued a memorandum order on June 30, 2008.  Among other things, the second PCR judge determined that the eyewitness testimony of Mr. Bellamy constituted newly discovered evidence that was material to a claim of self-defense and warranted granting a new trial.

The second PCR judge found that self-defense appeared to be a substantial issue because, if believed and not refuted, it indicated that Petitioner was acting in self-defense and that the victim was killed when an aggressor used the victim as a shield to the gunfire. The second PCR judge found that Petitioner had met the test set forth in State v. Spann, 513 S.E.2d 98 (S.C. 1999); that is, the newly discovered evidence (1) is such that it would probably change the result if a new trial were granted; (2) has been discovered since the trial; (3) could not in the exercise of due diligence have been discovered prior to trial; (4) is material; (5) is not merely cumulative or impeaching.

The second PCR judge found Petitioner to be credible when he stated that his decision to waive his claim of self-defense was because he could not get anyone to corroborate his claim of self-defense. ECF 19-16, 200-03.

The state filed a motion to supplement the record and/or motion for rehearing on or about July 2, 2008. The state argued that Petitioner's claim was barred because he had raised the testimony of Mr. Bellamy in his pro se supplemental brief on petition for writ of certiorari, and that in denying the Johnson petition the Court of Appeals had reviewed the merits of the entire record. Relying on United States v. Dale, 961 F.2d 819 (D.C. Cir. 1993), the state further argued that, when an individual refuses to testify at trial, his later testimony does not constitute new evidence. The state additionally argued that Mr. Bellamy's testimony was unreliable, that Petitioner waived all non-jurisdictional defects and defenses by pleading guilty, and that Mr. Bellamy's testimony was cumulative and therefore immaterial to overturn Petitioner's guilty plea.

By order filed August 18, 2008, the second PCR judge withdrew the June 30, 2008, memorandum order and ordered a hearing as to whether the newly discovered evidence issue had been raised to and ruled on by the Court of Appeals. The second PCR judge heard argument on

13

September 24, 2008. The state argued that Mr. Bellamy's affidavit had been submitted to the Court of Appeals in conjunction with his petition for writ of certiorari from the first PCR hearing. According to the state, the Court of Appeals could have remanded the issue to the first PCR judge for consideration. Instead, the Court of Appeals denied the petition, and in doing so, reviewed Mr. Bellamy's affidavit and found no issues of arguable merit. See ECF No. 19-16, 238-39.

Petitioner argued that he did not have the opportunity to raise Mr. Bellamy's testimony during the first PCR hearing because the information was not known to him. According to Petitioner, the Court of Appeals, despite ruling that it had reviewed the merits of the entire record, could not have reviewed Mr. Bellamy's affidavit in support of a claim of self-defense because this issue had not been preserved for review. Petitioner therefore argued that the issue of self-defense was properly before the second PCR judge. Id. at 240-44, 246-47.

The second PCR judge filed an order on October 14, 2008, in which he upheld his prior ruling and granted Petitioner a new trial based on after-discovered evidence of the testimony of Mr. Bellamy. The second PCR judge considered the possibility that Petitioner waived his self-defense claim by pleading guilty, but found fundamental fairness compelled a new trial. The second PCR judge opined:

> While the record demonstrates that a claim of self-defense was known to the Applicant from the outset and that his attorney tried to get someone to back up that claim, no one would come forward. This Court is concerned about granting a new trial because a claim of self-defense can be waived. Yet, no law has been cited to the Court concerning whether the entry of a guilty plea where self-defense was specifically mentioned, constitutes a waiver of that defense and prohibits granting a new trial on after-discovered evidence when someone does not come forward to corroborate the claim. . . . He was facing life imprisonment. He entered a plea to a lesser offense because he could not get anyone to back up his claim of self-defense.

Id. at 261-62.

14

The second PCR judge rejected the state's assertion that the argument presented regarding Mr. Bellamy was barred by the previous decision of the Court of Appeals.  The second PCR judge determined that Petitioner met his burden of proof as to the issue of after-discovered evidence in the form of eyewitness testimony, as well as his burden of proof as to prejudice.  Id. at 264.

On or about April 22, 2009, the state filed a petition for a writ of certiorari to the South Carolina Court of Appeals asserting the following issues:

> ARGUMENT 1: Whether the PCR court erred because an issue presented in a pro se Johnson response during a prior PCR appeal cannot, for the purposes of a subsequent/successive PCR, be newly discovered evidence per Rule 17-27-45(c))?
>
> ARGUMENT 2: Whether the PCR court erred by finding a witness' testimony is newly discovered when that witness admits they would have originally refused to testify/cooperate?
>
> ARGUMENT 3: Whether the PCR court erred by finding that testimony was "newly discovered" when everything the witness testified to was known all along?
>
> ARGUMENT 4: Whether the PCR court erred by granting relief because the Bellamy testimony, if believable, establishes that there was no sufficient legal provocation–by the victim–to warrant a manslaughter charge?
>
> ARGUMENT 5: Whether the PCR court erred because self-defense is not a valid defense when an innocent 3rd party victim is killed?
>
> ARGUMENT 6: Whether the PCR court erred by granting relief because the self-defense claim, as argued, is invalid because it was a disproportionate response?

Id. at 281-82.

In an unpublished opinion filed July 18, 2012, the Court of Appeals affirmed the ruling of the second PCR judge as follows:

> PER CURIAM: The State appeals the grant of Matthew Jamison's second petition for post-conviction relief (PCR) arguing the petition was successive and should have been procedurally barred.  The State further contends the PCR court erred in several respects in concluding the petition sufficiently established the existence of after-

discovered evidence warranting the withdrawal of Jamison's guilty plea to involuntary manslaughter and the granting of a new trial. We affirm pursuant to Rule 220(b)(1), SCACR, and the following authorities: S.C. Code Ann. § 17-27-70(b) (2003) ("When a court is satisfied, on the basis of the application . . . that the applicant is not entitled to post-conviction relief . . . it may indicate to the parties its intention to dismiss the application and its reason for so doing."); *id.* ("Disposition on the pleadings and record is not proper if there exists a material issue of fact."); *Odom v. State*, 337 S.C. 256, 261, 523 S.E.2d 753, 755 (1999) ("All applicants are entitled to a full and fair opportunity to present claims in one PCR application.") (emphasis added); *Greene v. State*, 276 S.C. 213, 214, 277 S.E.2d 481, 481 (1981) ("On appeal from an order granting post-conviction relief, our review is limited to whether there is any evidence to support the trial court's findings of fact."); *State v. Irvin*, 270 S.C. 539, 545, 243 S.E.2d 195, 197 (1975) ("A motion for a new trial based on after-discovered evidence is addressed to the sound discretion of the trial judge."); *State v. De Angelis*, 256 S.C. 364, 369, 182 S.E.2d 732, 734 (1971) (stating absent error of law or abuse of discretion, this court will not disturb the trial court's judgment); *State v. Wharton*, 381 S.C. 209, 215, 672 S.E.2d 786, 789 (2009) ("[T]he applicability of the doctrine of transferred intent to voluntary manslaughter cases where the defendant kills an unintended victim upon sufficient legal provocation committed by a third party remains an unsettled question in South Carolina."); *De Angelis*, 256 S.C. at 369, 182 S.E.2d at 734 (considering whether the defendant could withdraw his guilty plea based on after-discovered evidence and stating "there are cases that motions of this character should be entertained and granted in order that wrongs done may be remedied").

Id. at 391-92. The Court of Appeals denied rehearing by order filed August 22, 2012. ECF No. 19-16, 398.

The state next sought a petition for a writ of certiorari from the South Carolina Supreme Court. The state raised the following claims:

ARGUMENT 1: The Court of Appeals and the PCR court erred because an issued presented in a pro se Johnson response during a prior PCR appeal cannot, for the purposes of a subsequent/successive PCR, be newly discovered evidence per S.C. Code § 17-27-45(C).

ARGUMENT 2: Because a guilty plea is a waiver of defenses, the Court of Appeals erred by not reversing the PCR court's order granting relief when the order was based on an error of law.

ECF No. 19-10, 2.

The South Carolina Supreme Court issued an opinion on October 22, 2014, in which it reversed the Court of Appeals. The Supreme Court first determined that, contrary to the state's contention, Petitioner's newly discovered evidence claim was not procedurally barred. According to the Supreme Court,

> Although Bellamy's affidavit was presented to the court of appeals in [Petitioner's] pro se petition, it was not properly before the court of appeals because it was not part of the lower court record. . . . Because the discovery of Bellamy's testimony was not properly before the court of appeals, it was not part of the *Johnson* review. . . . Therefore we find, as a procedural matter, this issue was properly raised in [Petitioner's] second PCR application.

ECF No. 19-12, 9.

The Supreme Court then turned to the issue of whether and to what extent an otherwise valid guilty plea may be vacated in PCR proceedings on the basis of newly discovered evidence. The Supreme Court noted that,

> [t]raditionally, in South Carolina, "[t]o obtain a new trial based on after discovered evidence, the party must show that the evidence (1) would probably change the result if a new trial is had; (2) has been discovered since trial; (3) could not have been discovered before trial; (4) is material to the issue of guilt or innocence; and (5) is not merely cumulative or impeaching." *McCoy v. State*, 401 S.C. 363, 368 n.1, 737 S.E.2d 623, 625 n.1 (2013) (quoting *Clark v. State*, 315 S.C. 385, 387-88, 434 S.E.2d 266, 267 (1993)).

ECF. No. 19-12, 9.

A majority of the court (Justice Kittredge, joined by Justices Toal and Hearn) found that the traditional, five-factor newly discovered evidence test is not the proper test for analyzing whether a PCR applicant is entitled to relief on the basis of newly discovered evidence following a guilty plea. The majority held that,

> when a PCR applicant seeks relief on the basis of newly discovered evidence following a guilty plea, relief is appropriate only where the applicant presents

> evidence showing (1) the newly discovered evidence was discovered after the entry
> of the plea and, in the exercise of reasonable diligence, could not have been
> discovered prior to the entry of the plea; and (2) the newly discovered evidence is of
> such a weight and quality that, under the facts and circumstances of that particular
> case, the "interest of justice" requires the applicant's guilty plea to be vacated.  In
> other words a PCR applicant may successfully disavow his or her guilty plea only
> where the interests of justice outweigh the waiver and solemn admission of guilt
> encompassed in a plea of guilty and the compelling interests in maintaining the
> finality of guilty-plea convictions.

Id. at 11-12.

Turning to the facts, the majority found evidence in the record to support the PCR judge's finding that Petitioner could not have discovered Bellamy's testimony prior to pleading guilty.  The majority concluded, however, that the interests of justice did not require the guilty plea and sentence be vacated.  The majority observed that Petitioner admitted having a gun and shooting the victim, specifically waived his right to present any defense, and testified that he did so freely and voluntarily.  The majority thereupon reinstated Petitioner's conviction and sentence pursuant to his guilty plea. Id. at 12-13.

A dissenting opinion (Justice Pleicones, joined by Justice Beatty) adhered to the traditional test and would have upheld the second PCR judge's order.  The dissent first noted that the majority had adopted a new test, and that the "interest of justice" standard required a factual determination that should be made by the PCR judge.  Thus, the dissent would have remanded the case to the second PCR judge to determine whether Mr. Bellamy's testimony constituted after-discovered evidence under the new analytical framework.  Id. at 14.

In addition, the dissent found there was evidence in the record to affirm the lower court under the five factors set forth in McCoy:

> (1) Bellamy testified that Jig had a gun, and [Petitioner] shot Jig after Jig gestured

18

towards [Petitioner] in a manner that suggested Jig was going to pull out his weapon; (2) [Petitioner] discovered Bellamy's testimony after the entry of his guilty plea; (3) [Petitioner] could not have discovered the testimony before his plea because Jig secured Bellamy's silence by threatening Bellamy and his family; (4) Bellamy's testimony is material because it tends to prove [Petitioner's] claim of self-defense; and (5) Bellamy's testimony is not merely cumulative or impeaching because no one gave the police a statement as to what happened on the night of victim's murder.

ECF No. 19-12, 14-15.

A petition for rehearing was denied by the majority. ECF No. 19-13. The remittitur was issued on December 4, 2014. ECF No. 19-14.

Petitioner's § 2254 petition asserts the following grounds for relief:

GROUND ONE: Denied the actual effective assistance of criminal defense counsel. Petitioner engaged an involuntary guilty plea where trial counsel pressured guilty plea by promise of 11-13 year(s); counsel stated petitioner faced death penalty at trial[.]

GROUND TWO: Due process violation. Jamison's 2nd APCR raised the issue of after-discovered evidence which related to the aspect of asserting self-defense against a homicide offense; the South Carolina Supreme Court changed the criteria as his conviction was acquired by guilty plea to voluntary manslaughter. . . . The Court adopted the "interest of justice" test over the "traditional" test and applied it retroactively[.]

GROUND THREE: Denied due process and equal protection of the law (under full and fair hearing doctrine or rule) in state court. Petitioner has set forth the 2nd APCR was granted in the trial court on the "traditional" test of after-discovered evidence and South Carolina Supreme Court changed the relevant discovery rule (criteria) to the "interest of justice" test while applying the new rule retroactively and not allowing his issue or appeal to be remanded to the trial court for application of the new rule to weight, determine the evidence contrary to <u>TEAGUE</u> rule. So he was denied the full and fair opportunity along with hearing in the state court(s)[.]

ECF No. 1.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Bristow Marchant for a Report and Recommendation. The

petition is governed by the terms of 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.

Respondent filed a motion for summary judgment on December 14, 2015.  By order filed December 15, 2015, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Petitioner was advised of the summary judgment procedures and the possible consequences if he failed to respond adequately.  Petitioner filed a response in opposition on January 15, 2016.  On April 18, 2016, the Magistrate Judge issued a Report and Recommendation in which he determined that, with regard to Ground One, Petitioner failed to show that counsel's performance was deficient or that his guilty plea was not knowingly and voluntarily made.  With respect to Grounds Two and Three, the Magistrate Judge found no constitutional violation in the South Carolina Supreme Court's ruling that the interest of justice did not require a new trial under its newly created analysis.  The Magistrate Judge further determined that the Supreme Court's application of the "interest of justice" test to newly discovered evidence in a guilty plea case is a decision of state law, and not within the province of federal habeas review.  Accordingly, the Magistrate Judge recommended that Respondent's motion for summary judgment be granted.  Petitioner filed objections to the Report and Recommendation on June 6, 2016, and July 14, 2016.

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility for making a final determination remains with this court.  Mathews v. Weber, 423 U.S. 261, 270 (1976).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge.  28 U.S.C. § 636(b)(1).  This court may also receive further evidence or recommit the matter to the Magistrate Judge with instructions.  Id.  This court is obligated to conduct a de novo review of every portion of the

20

Magistrate Judge's report to which objections have been filed.  Id.

## II.  DISCUSSION

A writ of habeas corpus shall not be granted for any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The limited scope of federal review of a state petitioner's habeas claims is grounded in fundamental notions of state sovereignty.  Richardson v. Branker, 558 F.3d 128, 138 (4th Cir. 2012) (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)).  When a federal court adjudicates a habeas corpus petition brought by a state prisoner, that adjudication constitutes an intrusion on state sovereignty.  Id. (citing Harrington, 562 U.S. at 103).  A federal court's power to issue a writ is limited to exceptional circumstances, thereby helping to ensure that "'state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.'"  Id. (citing Harrington, 562 U.S. at 103).  The restrictive standard of review "'further[s] the principles of comity, finality, and federalism.'"  Id. (citing Williams v. Taylor, 529 U.S. 362, 364 (2000)).  "'The pivotal question is whether the state court's application of the [applicable federal legal] standard was unreasonable.'"  Id. (quoting Harrington, 562 U.S. at 103).  So long as fairminded jurists could disagree on the correctness of a state court's decision, a state court's adjudication that a habeas claim fails on its merits cannot be overturned by a federal court.  Id. (citing Harrington, 562 U.S. at 102).

21

A.     <u>Ground One</u> (Ineffective Assistance of Counsel/Involuntary Plea)

Petitioner contends that he received ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The petitioner first must show that counsel's representation fell below an objective standard of reasonableness. <u>Id.</u> at 687–88. In making this determination, a court considering a habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689. However, an error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. <u>Id.</u> at 691-92 (citing <u>United States v. Morrison</u>, 449 U.S. 361, 364–65 (1981)). "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." <u>Id.</u> at 692.

In <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985), the United States Supreme Court discussed the application of the rule regarding deficient performance in cases where the defendant does not go to trial, but instead enters a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to

22

advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

Id. at 57-59 (internal citations omitted).

In this case, Petitioner contends that he was misled by counsel into believing that going to trial could result in the death penalty. For a guilty plea to be valid, the Constitution imposes the minimum requirement that the plea be the voluntary expression of the defendant's own choice. United States v. Harper, 627 F. App'x 262, 262 (4th Cir. 2016) (quoting United States v. Moussaoui, 591 F.3d 263, 278 (4th Cir. 2010)). In evaluating the constitutional validity of a guilty plea, courts look to the totality of the circumstances surrounding the plea, granting the defendant's solemn declaration of guilt a presumption of truthfulness. Id. (quoting Moussaoui, 691 at 278). As the Magistrate Judge correctly observed, the trial judge conducted a colloquy with Petitioner in which Petitioner averred that he understood his rights, that he had not been coerced or threatened, that he wanted to plead guilty, and that he was in fact guilty of shooting the victim.

The court cannot say that the state courts' decisions are contrary to, or involved an unreasonable application of, clearly established Federal laws, or were based on an unreasonable determination of the facts in light of the evidence presented. Petitioner's objection is without merit.

B.    Grounds Two and Three (Retroactive Application of "Interest of Justice" Test)

As the Magistrate Judge properly observed, the creation and application of the "interest of justice" test is a matter of state procedural law. A matter of the application of state law is not subject to federal habeas review absent a finding that the application violated Petitioner's federal constitutional rights.

In Robinson v. Cross, 121 F. Supp. 2d 882 (E.D Va. 2008), the Eastern District of Virginia

23

addressed a similar scenario to that before the court:

> Robinson's second claim alleges that in affirming his conviction, the Supreme Court of Virginia violated his due process rights by fashioning a new exception to the hearsay rule and applying it retroactively to his case. The crux of this due process claim is the absence of fair notice. Specifically, Robinson contends that it was fundamentally unfair for the Supreme Court of Virginia to fashion a new rule of evidence in the course of his appeal and then apply it, in effect retroactively, to him. The essential error of Robinson's argument is that while due process entitles a criminal defendant to notice of the charge against him, including the offense elements the prosecution must prove, it does not require that a criminal defendant have notice of precisely how the government intends to prove each of those elements. There is, in short, no due process right that entitles criminal defendants to pretrial notice of precisely what evidence the prosecution will present to prove the charges in the indictment.

Id. at 886.

The procedural posture of the within § 2254 petition is different from Robinson, however, because here the majority's imposition of a newly created evidentiary ruling prohibited Petitioner from asserting self-defense at a new trial based on after-discovered evidence. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. Washington v. Texas, 388 U.S. 14, 19 (1967). The court concludes that the case should have been remanded to the second PCR judge in order for Petitioner to make his case for a new trial utilizing the "interest of justice" test.

In this case, Petitioner has never disputed shooting at Jig, but has steadfastly asserted that Jig threatened him with a gun. It is undisputed that trial counsel diligently attempted to find a witness to support Petitioner's version of the facts, but no one would give a statement until Mr. Bellamy came forward. It also is undisputed that Jig previously had attacked Petitioner and had shot a weapon at him. Under these facts and the second PCR judge's decision that it would be

24

fundamentally unfair to prevent Petitioner from seeking to establish a claim of self-defense, the affirmance of the second PCR judge by the South Carolina Court of Appeals, and the dissenting opinion of Justices Pleicones and Beatty, the court concludes that the South Carolina Supreme Court majority's application of a newly created evidentiary rule was contrary to, or involved an unreasonable application of, clearly established Federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner's § 2254 petition is granted as to this sole issue.

## III.  CONCLUSION

For all these reasons, the court concludes that the matter of whether Petitioner can establish the right to a new trial under the "interest of justice" test should be brought before a PCR judge for additional proceedings. Respondent's motion for summary judgment (ECF No.18) is **granted in part and denied in part**.  Petitioner's § 2254 petition is **denied and dismissed in part**, with prejudice, and **granted in part**.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable.  Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001).  The court concludes that Petitioner has not made the requisite showing with respect

to Ground One.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

September 28, 2016.

**NOTICE OF RIGHT TO APPEAL**

**The parties are hereby notified of the right to appeal this order
pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.**

26